**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION**

| | |
|---|---|
| **PAY AS YOU GO, LLC,** | C.A. No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| **IDT CORPORATION,** | **PATENT CASE** |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Pay As You Go, LLC, files this Complaint for Patent Infringement against IDT Corporation, and would respectfully show the Court as follows:

**I.   THE PARTIES**

1.      Plaintiff Pay As You Go, LLC ("PAYG" or "Plaintiff") is a Texas limited liability company having an address at 1 East Broward Boulevard, Ste 700, Fort Lauderdale, FL 33301.

2.      On information and belief, Defendant IDT Corporation. ("IDT" or "Defendant") is a Delaware corporation with a regular and established place of business at 520 Broad Street, Newark, New Jersey, 07102.  Defendant has a registered agent at Corporation Service Company, Princeton South Corporate Ctr., Suite 160, 100 Charles Ewing Blvd, Ewing, NJ 08628.

**II.   JURISDICTION AND VENUE**

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction of such action under 28 U.S.C. §§ 1331 and 1338(a).

4.      On information and belief, Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to due process and the New Jersey Long-Arm Statute, due at least

1

to its business in this forum, including at least a portion of the infringements alleged herein at 520 Broad Street, Newark, New Jersey, 07102.

5.     Without limitation, on information and belief, Defendant has derived revenues from its infringing acts, including use of the Accused Instrumentality, occurring within New Jersey. Further, on information and belief, Defendant is subject to the Court's general jurisdiction, including from regularly doing or soliciting business, engaging in other persistent courses of conduct, and deriving substantial revenue from goods and services provided to persons or entities in New Jersey.  Further, on information and belief, Defendant is subject to the Court's personal jurisdiction at least due to its sale of products and/or services within New Jersey.  Defendant has committed such purposeful acts and/or transactions in New Jersey such that it reasonably should know and expect that it could be sued in this Court as a consequence of such activity.

6.     Venue is proper in this District under 28 U.S.C. § 1400(b). On information and belief, Defendant has a regular and established place of business in New Jersey and in this District at 520 Broad Street, Newark, New Jersey, 07102.  On information and belief, from and within this District, Defendant committed acts of infringement, including at least a portion of the infringements at issue in this case.

7.     For these reasons, personal jurisdiction exists and venue is proper in this Court under 28 U.S.C. § 1400(b).

### III.  THE PATENT-IN-SUIT

8.     Plaintiff incorporates the above paragraphs herein by reference.

9.     On March 14, 2006, United States Patent No. 7,013,127 ("the '127 Patent") was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '127 Patent is attached hereto as Exhibit A and incorporated herein by reference.

10.     PAYG is the assignee of all right, title, and interest in the '127 patent, including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the '127 Patent.  Accordingly, PAYG possesses the exclusive right and standing to prosecute the present action for infringement of the '797 Patent by Defendant.

## Background of the Invention

11.     The '127 Patent relates to telecommunications services and methods that enable a user and/or other responsible party to make payments as the user uses the telecommunication services.

12.     As described in the specification of the '127 Patent, before the invention claimed in the '127 Patent, it was known in the art of telecommunication services to provide calling card accounts to customers. A customer would receive account information in the form of a personal identification number ("PIN") and a toll-free access number that allowed the customer to utilize the account. Those accounts were generally one of two types: (1) a pre-paid account, which was an account with a pre-defined amount of usage paid for in advance by the customer; and (2) a usage-based account, which was an account that is billed on a periodic billing cycle according to usage during the billing period. Pre-paid wireless (cell phone) service was one example of a pre-paid account.

13.     Prior to the '127 Patent, pre-paid wireless service enabled customers to use the convenience of cellular and digital communications by establishing a pre-paid account with a wireless telecommunication vendor. Typically, pre-paid wireless cards, each card corresponding to a wireless services account, were purchased in preset denominations, such as $20, $50 or $100, often from a limited number of locations. Each card provided the user with a specified amount of wireless calling dollars or minutes. After the initial allocation was exhausted, the user could

3

"recharge" or reload their wireless account, usually by calling a toll-free number, and either talking with a customer service representative or using an automated system to charge additional calling dollars or minutes to a credit card.

14.    There were many inventions directed to these types of systems and methods.  For example, U.S. Pat. No. 6,185,545 discloses a method for effecting payment of goods or services that establishes an intermediary account associated with the user account to permit the user to pre-pay for telecommunications services.  Another patent, U.S. Patent No. 6,282,276, discloses value-added service calls that traditionally have been "800" or "900" number calls.  U.S. Patent No. 6,397,055 discloses a system and method for charting a pre-paid wireless call user.  U.S. Patent No. 6,424,706 discloses a system and method for accessing the value associated with a pre-purchased amount of telecommunication time.  WO 01/82582 discloses communication billing systems that provides interrelated processing of wireless service events and wire line service events.  WO 02/11422 discloses a communication account system for dynamically providing communication accounts to communication devices for immediate transfer to users, including a means for determining an amount of prepaid time for communication.

15.    These prior art pre-paid systems were burdensome to both the user and the telecommunication service provider. Moreover, these prior art pre-paid systems generally required that the user have a current credit card with an available balance, which created a significant burden in and of itself to certain classes of user, such as individuals who lacked sufficient regular income, individuals with too much existing debt, individuals with poor credit histories, and individuals who lacked and/or were unable to obtain a social security number.

4

**The Patented Invention**

16.     The '127 Patent discloses specific improved methods for effecting payment for pay-as-you-go telecommunication services via a third-party. The claimed method comprises: monitoring a user's use of telecommunication services at regular time intervals; communicating results of the monitoring to the provider of the telecommunication services, who then processes the results and communicates those to the user; and receiving a payment from the user, wherein: (i) the payment is received from the user at a third-party point-of-sale together with an account identifier, (ii) data indicative of the payment transaction is received sale by the telecommunication services provider from the third party; and (iii) an amount of money equal to the payment is received by the telecommunications services provider from the third-party. The point-of-sale can be a physical location, such as a retail merchant site; a vending machine; and an automated teller machine, or a virtual location, such as a website or application. The payment at the point-of-sale can be made in any acceptable form, including cash, a wire-transfer or bank-transfer, a debit card transaction, and a credit card transaction.

17.     The methods of the claimed invention are an improvement over conventional methods that allow a user to pay as the telecommunication services are being used (*i.e.*, "pay-as-you-go"). Various embodiments of pay-as-you-go methods are illustrated in FIG. 1 and FIG. 2 of the '127 Patent.

18.     Unlike standard mobile phone calling plans that charged a set monthly fee for a specific amount of calls or usage, pay-as-you-go plans only required the user to purchase minutes or usage when they would like to make a call or use the telecommunication services. This was a significant advantage to consumer-users who did not want to be bound by an annual, or even biannual, contract, as well as to consumer-users who did not possess sufficient credit (or credit-

worthiness) to qualify for such a contract. This latter group included not only individuals with bad credit ratings, but also hourly-wage earners, individuals under the age of 18, and individuals unable to obtain a social security number.

19.     Pay-as-you-go calling plans also represented an advance to consumer-users who, for whatever reason, wanted to preserve their privacy and so were reluctant to enter into a contract with a telecommunications service provider that would require the disclosure of confidential personal information, like the consumer-user's name, home address, social security number, and the like. In 2020, there were approximately 74 million pay-as-you-go consumer-users in the United States.

20.     Pay-as-you-go systems also provide an advantage for telecommunication service providers.  With pay-as-you-go systems, use of the telecommunication services can be suspended by the telecommunication services provider upon the available balance in a user's account being fully consumed. And, because use is monitored at regular time intervals, such a suspension can generally be achieved before the user and/or the responsible party accumulates any balance due.

21.     However, a significant drawback of prior art pay-as-you-go systems and methods was the inability to add extra time or services after the initial purchase of the phone and time without a credit or debit card. Because of this, many prior art pay-as-you-go systems and methods were almost as bad as standard mobile phone calling plans for individuals with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers. Such systems and methods were also less-than-desirable for individuals who wished to protect their private, personal confidential information and/or preserve their anonymity through cash-only transactions or the like. For all of those different groups of individuals, prior to the invention of the methods claimed in the '127 Patent, the only solution to the problem of running

6

out of time was to purchase another pre-paid phone altogether—a "solution" which could end up being prohibitively expensive in the long term.

22.    Unlike prior art pay-as-you-go systems and methods which required direct payment from a user to the telecommunications service provider via a credit or debit card to add time or data for further use, the methods of the invention claimed in the '127 Patent permit a user to make payments via a third-party point-of-sale site. Such a third-party point-of-sale site may be a physical location, such as a gas station or convenience store equipped with an electronic point-of-sale device, or a virtual location, such as a website or app like PayPal® or Venmo®. While such payments can be made electronically, *e.g.*, via credit card, debit card, check card or any other such means, including on-line banking, they do not have to be made electronically like the prior art systems required. Rather, payments according to the invention claimed in the '127 Patent can also be made in cash, *i.e.*, the user can make a payment with cash at a designated location, and the amount paid at the designated location will credited to the user's account to cover the services rendered in step 68 of FIG. 2.

23.    To use a designated location 12 to make payment, a user 10 may be issued an account identifier 14, *e.g.*, an individual account number, in step 62 of FIG. 2, that uniquely identifies that user 10. Such an account identifier 14 enables a user 10 to make a payment at the designated location in step 64 of FIG. 2. As noted above, this may be done, *e.g.*, via a point-of-sale terminal 16, where a user's credit card or debit card is "swiped" both to identify the user 10 and to collect payment of a specified amount, or where a user physically inserts cash in the form of paper bills and/or metal coins and enters his/her account identifier via a pin pad or the like. The payment information is then relayed to the telecommunication services provider 18 in step 66 of FIG. 2. The designated location 12 can be any physical or virtual location that processes a credit

7

or debit card and/or can accept cash, *e.g.*, retail stores such as a dry cleaner, a drug store, a supermarket, or a convenience store, etc., and websites and mobile applications like PayPal®.

24.    The inventions claimed in the '127 Patent include methods that enable a user of pay-as-you-go telecommunication services to make payments for those telecommunications services via a third-party point-of-sale.

25.    Prior to the invention claimed in the '127 Patent, users of telecommunications services that did not have a credit card, debit card, and/or linkable bank account were generally unable to use "pay as you go" systems. This requirement presented a problem to users with bad credit ratings, hourly-wage earners, and individuals under the age of 18, as well as individuals who wished to protect their privacy and/or preserve their anonymity.

26.    The methods claimed in the '127 Patent are directed to novel ways of permitting users of telecommunications services to purchase those services on an as-needed basis without needing a credit card, debit card or linkable bank account, and without having to disclose personal identifying information. This represents a significant advantage to users with bad credit ratings, hourly-wage earners, individuals under the age of 18, and individuals without social security numbers, as well as individuals who wished to preserve their anonymity.

27.    Claim 1 also provides a specific technical solution for integrating disparate systems, including telecommunication usage monitoring systems, telecommunication billing systems, and retail point-of-sale systems into a unified payment framework.  For example, the limitation "monitoring a user's use of the telecommunication services at regular time intervals" is a technical element that involved not merely collection information but implements a specific technical monitoring mechanism that executes operations at defined intervals, which differs from traditional post-paid billing cycles.  This real-time processing capability requires technical infrastructure to

capture, process, and communicate usage data at predetermined intervals rather than relying on traditional monthly billing cycles.  This represents a technical advancement because it enables immediate awareness of usage patterns and allows for responsive system actions based on current usage data. The specification of US 7,013,127, in column 4, lines 44-49, describes this as enabling the telecommunication services provider to produce "the equivalent of an updated invoice" immediately upon completion of service use.  The technical implementation requires the system to maintain a running tally of usage that is updated every monitoring interval, implement algorithms to aggregate these frequent data points into billable amounts, and provide instant access to this information when the user ends their session. This transformation from reactive billing systems to proactive usage management represents a technical solution to the problem of efficiently allocating resources and notifying users in telecommunication services. Regular interval monitoring establishes a technical framework that maintains ongoing awareness of system utilization, enabling both service providers and users to make informed decisions based on current usage data rather than historical data.

28.     The limitation "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" is a technical limitation requiring a specific technical data flow and processing architecture, which is not a generic communication concept.  The claimed invention implements a communication framework for relaying usage information and payment status. As described in the specification of US 7,013,127, in column 4, lines 52-57, "[t]he telecommunication services provider 18 then relays this information in step 78 of FIG. 2 back to the user 10 via e-mail 30, via interactive web access 40, via SMS 42, via MMS 44, and/or via a voice and/or a data call 46…."  (Ex. A at 4:51-55).  This multi-channel approach represents a

9

technical solution because it implements multiple communication pathways to ensure users receive timely information about their usage and account status. The system can notify users through various technical means, adapting to user preferences and device capabilities. The specification describes that this includes notification "if the user 10 is at a pre-designated limit," demonstrating proactive account management. (Ex. A at 4:55-57). This limitation defines a specific technical protocol for data exchange. This is not generic communication but a defined technical flow: usage data → provider → processing → user notification.

29.     The limitation "receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier" is another technical limitation requiring a specific technical implementation that utilizes account identifiers in point-of-sale systems, rather than any particular payment method. The limitation "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider" is another technical limitation requiring a specific three-part technical reconciliation system, which is not a simple payment transfer. This limitation requires a specific technical reconciliation mechanism that tracks and settles payments across multiple parties. Claim 1 of the '127 Patent therefore solves a technical problem by creating an integrated architecture or integrated system that enables real-time monitoring, immediate billing, and distributed payment processing through retail infrastructure.

30.     The claimed invention also implements integration at the network level between telecommunication services networks and payment processing systems. As shown in Fig. 1 of the '127 Patent, the claimed invention requires technical connections between the telecommunication

services network 24, the telecommunication services provider 18, point-of-sale terminals 16, and various communication channels.  Figure 1 and the accompanying description in the specification of the '127 Patent demonstrate that the telecommunication services network 24 is technically coupled with the telecommunication services provider 18 through data communication pathways that enable transmission of call detail records (CDRs) and usage monitoring data. The point-of-sale terminals (16) are integrated into this architecture through the establishment of secure communication channels that permit the transmission of payment transaction data, including account identifiers and payment amounts, to the telecommunication services provider (18). This network-level integration enables real-time data flow between disparate systems, creating a unified technical framework for service monitoring, billing, and payment processing.

31.     The technical framework achieves unification through the implementation of a centralized data processing architecture at a telecommunication services provider, which serves as the integration hub for disparate data streams. The network-level integration is evidenced by the invention's ability to correlate usage data from the telecommunication services network with payment data from point-of-sale terminals, enabling immediate account updates and service adjustments.  The data flow capability is achieved through event-driven architectures where state changes in one system component trigger notifications and updates in connected systems. Traditional telecommunication billing systems operated with temporal delays between service usage, billing calculation, and payment processing, with each function residing in isolated systems that exchanged data through batch processes.  The invention coordinates multiple technical systems, including telecommunication networks, point-of-sale systems, communication platforms (such as email, SMS, MMS, and voice), and interactive voice and data systems. This coordination creates a comprehensive technical ecosystem for pay-as-you-go telecommunication services.

32.     Claim 1 of the '127 Patent cannot be performed with mental processing, along with pen and paper.  The step of "monitoring a user's use of the telecommunication services at regular time intervals" cannot be manually performed as it necessitates a technical integration within a telecommunication network.   Nor can "communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user" be performed manually because it also requires a technical integration within a telecommunication network and the ability to process results from such electronic monitoring.

33.     The claims of the '127 Patent are therefore not directed to an abstract idea or law of nature.

34.     The claims of the '127 Patent provide solutions to a specific and persistent problems that existed with conventional pay-as-you-go systems and methods, including how could certain users (such as individuals with bad or no credit, hourly-wage earners, individuals under the age of 18, individuals without a social security number, and individuals who wished to maintain their privacy) continue to use a prepaid phone or similar device once the original time had expired and/or been consumed. The inventions claimed in the '127 Patent provide a real-world solution to that real-world problem.

35.     The invention described in the claims of the '127 Patent enables users to add to a pre-paid phone or similar device after the initial purchase thereof without using a credit or debit card or bank account and without needing to reveal personal confidential information, such as an individual's name or social security number. The patented invention does this by enabling such users to provide payment to the telecommunications service provider through a third-party willing

to accept forms of payment other than a credit or debit card, including virtual sites, like PayPal®, and brick-and-mortar businesses, like convenience stores and gas stations.

36.    The claimed invention also has several inventive concepts.

37.    The claimed invention is distinguishable from claims that merely recite generic steps of "receiving," "authenticating," and enabling transactions without specifying how these functions are performed.  Claim 1 of the '127 patent specifies how monitoring occurs (*e.g.*, at regular time intervals), how communication flows (*e.g.*, specific bi-directional paths with processing; usage data → provider → processing → user notification), how payment is integrated (*e.g.*, through point-of-sale transactions using account identifiers), and how reconciliation occurs (*e.g.*, three-part settlement system, involving a telecommunication services provider, a point-of-sale proprietor, and a user). It was not routine, well-known, or conventional to use any of these limitations at the priority date of the '127 Patent.

38.    The use of "a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider" represents an unconventional technical solution because it creates a new payment pathway that leverages existing retail infrastructure for telecommunication services.  For example, "[t]he designated location 12 can be any location that processes a credit card, e.g., retail stores such as the dry cleaners, the drug store, the supermarket, etc." (Ex. A at 4:34-37).  The technical implementation requires coordination between disparate systems, including retail point-of-sale terminals and telecommunication billing systems, to create a unified payment ecosystem. This goes beyond traditional payment methods by enabling cash payments through a distributed network of retail locations.

39.    The independent Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

40.    Claim 1 also recites "a payment is received from the user at a point-of-sale together with an account identifier," necessitates the implementation of a technical interface at the point of sale. The point-of-sale terminal must be configured to accept the account identifier associated with telecommunication services. The terminal must be programmed to process payments designated for telecommunication accounts rather than retail purchases. The system must implement data capture mechanisms that associate the payment amount with the specific account identifier.

41.    Claim 1 further recites that "data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider." This element requires the establishment of a communication pathway between the retail point-of-sale system and the telecommunication services provider's billing infrastructure. The technical implementation must include secure data transmission protocols. The system must implement authentication mechanisms to verify legitimate transactions. The system must provide real-time or near-real-time data synchronization to ensure timely account crediting.

42.    Claim 1 also recites "an amount of money equal to the payment amount is received from a point-of-sale proprietor by the telecommunication services provider," which establishes a unique payment architecture for telecommunication systems. This architecture involves three

distinct parties in each transaction. The user provides payment at the retail location. The point-of-sale proprietor collects and temporarily holds these funds. The telecommunication services provider ultimately receives the payment from the proprietor. This three-part system necessitates the implementation of sophisticated tracking and reconciliation mechanisms. The system must maintain transaction records that link each user's payment to the corresponding account identifier. The technical implementation requires the establishment of a trusted intermediary relationship. The point-of-sale proprietor effectively becomes a payment agent for the telecommunication services provider. This relationship requires technical mechanisms for transaction verification and dispute resolution.

43.     The ordered combination of the claim limitations was also not routine, well-known, or conventional at the priority date of the '127 Patent.  The claimed invention's interval-based monitoring represents an unconventional technical solution to the problem of real-time billing and account management. As described in the specification of '127 Patent, the system monitors usage "at regular time intervals... e.g., at 5-, 10-, 15- or 30-minute intervals." (Ex. A at 4:40-44). This granular monitoring enables immediate billing calculations and account management decisions. Similarly, the technical advancement is further described in the '127 Patent, which describes how "Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated."  (Ex. A at 2:26-32).  The invention's ability to monitor and process usage data at regular intervals enables dynamic account management, including the automated suspension and reactivation of accounts based on payment status. This creates a technical framework that prevents debt accumulation while maximizing service availability.

15

44.    The technical implementation differs from traditional billing architectures. Traditional systems employ batch processing models with monthly data aggregation. The claimed system implements stream processing with continuous data flow.  As explained in the '127 Patent, "Call charge information associated with the use of the telecommunication services is virtually simultaneously accessible by the user when the use of the services is terminated."  (Ex. A at 2:26-32).  This capability requires the system to maintain real-time usage accumulators. The invention implements calculation engines that process accumulated interval data upon session termination. The invention must also provide data access interfaces for user queries.

45.    The comprehensive data flow system described in Claim 1 creates an interconnected network of information exchange that enables sophisticated management of telecommunication services. The process begins with the monitoring component, which tracks a user's telecommunication usage at regular time intervals. As described in the '127 Patent, this monitoring generates detailed usage data that captures when services are used, for how long, and what types of services are consumed. (Ex. A at 4, lines 40-57).  This raw monitoring data then flows to the telecommunication services provider through established communication channels. The telecommunication services provider acts as the central processing hub in this ecosystem. When the provider receives the monitoring results, it processes this information to create meaningful data for the user. As disclosed in the '127 Patent, the provider produces "the equivalent of an updated invoice" from the call detail records received from the telecommunications services network. (Ex. A at 4:46-49).  This processing involves calculating charges, applying rate plans, and preparing comprehensive account status information. The provider can then communicates these processed results back to the user through one of multiple available channels. (*Id.* at 4:51-57).

46. The claims of the '127 patent recite a particular way of effecting such payments via a third-party point of sale site, which are not generic and do not preempt alternate methods of payment. Alternative ways exist and are known for a user to affect payment for pay-as-you-go telecommunications services, including the prior art method of submitting a credit or debit card directly to the provider of the telecommunications services.

### IV.  COUNT I
### (PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 7,013,127)

47. **Direct Infringement.** Upon information and belief, Defendant directly infringed claim 1 of the '127 Patent in New Jersey, this District. and elsewhere in the United States. As shown below, Defendant performed steps of a pay-as-you-go method for affecting payment of telecommunication services with its usage-based pricing (Pay-per-Usage) plan that satisfied each limitation of claim 1 of the '127 Patent.  IDT provides the BOSS Revolution monetization platform, which is an all-in-one solution that enables merchants to offer and sell their services (*e.g.*, software, telecommunication services, PDF access, etc.) on a subscription, usage-based, or pay-as-you-go model.  All steps of the asserted claim were performed using the BOSS Revolution monetization platform.

48. Defendant provided a Pay-per-Usage plan that allows merchants to charge customers based on their consumption of products and services, such as calls and messages ("telecommunication services"). For example, IDT provided the BOSS Revolution app, which enabled users to access international calling and mobile data services directly through the application with service charges applied on a pay-as-you-go basis. Users were charged a flat monthly fee of $5 and incur additional charges ("payment of telecommunication services") only based on their actual data usage.

17

# International Calling

At BOSS Revolution we believe that staying in touch shouldn't mean expensive fees or the need for a perfect internet connection. We make calling worldwide easy.

 **BOSS Revolution App**

Make international calls, send texts, and connect with some of the best rates for calling overseas.



(*E.g.*, https://www.idt.net/services/).[1]

# IDT Introduces BOSS Revolution Mobile(SM): Join the Savings Revolution

Get Big Savings – Pay Only For What You Use

NEWARK, N.J., Oct. 31, 2017 – IDT Corporation (NYSE: IDT), a global provider of communication and payment services, today launched BOSS Revolution Mobile[SM], a new U.S. mobile phone service that delivers big cost savings by allowing customers to pay for only what they use.

BOSS Revolution Mobile customers pay just $5/month for their line and then pay only for what they use.

BOSS Revolution Mobile customers pay just $5/month for their line and then pay only for what they use. Pay-as-you-go rates are affordable and simple:

- Domestic Airtime – just 1.5 cents per minute
- Domestic Texts – just 0.5 cents, and
- Data – just 1.5 cents per megabyte.

(*E.g.*, https://www.idt.net/idt-introduces-boss-revolution-mobilesm-join-the-savings-revolution/).

---

[1] Red boxes and text added to figures unless otherwise noted.

> 4.6    Cell Phone Use. When dialing an access number for BR Pinless from a cell phone, DO NOT PRESS "SEND" again after entering your destination number as this might result in additional charges from your wireless provider. Rather, you should wait for BR Pinless to commence automatically after dialing the destination number. When using BR Pinless with the App make sure that you are in the App before commencing your call or you may be charged by your mobile carrier. IDT is not responsible for any costs incurred by you if you incorrectly use BR Pinless, including without limitation cell phone provider charges.

(*E.g.*, https://cdn.bossrevolution.com/Content/pdf/IDT-TermsofUse-TelecomProducts.pdf, Page 7).

49.    Defendant performed the step of monitoring a user's use of the telecommunication services at regular time intervals. For example, the BOSS Revolution app required users to keep mobile data or Wi-Fi enabled and place calls directly through the application to avail the pay-as-you-go services. In doing so, the Boss Revolution app monitored multiple usage parameters such as call duration, messaging activity, and data consumption ("monitoring a user's use of the telecommunication services"), such that the users were charged only based on their actual usage of the services such as, on a per-minute basis for calls and per-megabyte basis for data ("at regular time intervals"). Further, for BOSS Revolution Mobile users, data charges were capped at $30 per month; once this threshold was reached, users continued to receive data for the remainder of the month at speeds of 64 kbps or higher without additional charges. This demonstrates that the app continuously tracked and monitored the customer usage of the services.

> 4.6    Cell Phone Use. When dialing an access number for BR Pinless from a cell phone, DO NOT PRESS "SEND" again after entering your destination number as this might result in additional charges from your wireless provider. Rather, you should wait for BR Pinless to commence automatically after dialing the destination number. When using BR Pinless with the App make sure that you are in the App before commencing your call or you may be charged by your mobile carrier. IDT is not responsible for any costs incurred by you if you incorrectly use BR Pinless, including without limitation cell phone provider charges.

(*E.g.*, https://cdn.bossrevolution.com/Content/pdf/IDT-TermsofUse-TelecomProducts.pdf, Page 7).

**Does the BOSS Revolution Calling App replace my current mobile service provider or mobile calling plan?**

The BOSS Revolution Calling App does **not** replace your current mobile service provider or plan. The app requires that you have a mobile data or Wi-Fi connection.

(*E.g.*, https://www.bossrevolution.com/en-us/support).

BOSS Revolution Mobile customers pay just $5/month for their line and then pay only for what they use. Pay-as-you-go rates are affordable and simple:

- Domestic Airtime – just 1.5 cents per minute
- Domestic Texts – just 0.5 cents, and
- Data – just 1.5 cents per megabyte.

BOSS Revolution Mobile customers pay just $5/month for their line and then pay only for what they use.

(*E.g.*, https://www.idt.net/idt-introduces-boss-revolution-mobilesm-join-the-savings-revolution/).

## Pay as you go

If you choose "Pay as you go", you can expect to use these rates for different services in your country. Total is applicable to single call minutes.

| Destination | Price | $10 Total |
|---|---|---|
| India | 3.3¢ / min | 303 min |
| India Cellular | 3.3¢ / min | 303 min |

(*E.g.*, https://www.bossrevolution.com/en-us/country/india).

Also, BOSS Revolution Mobile customers' data spend is capped at only $30 per month. After a customer spends $30 on data, data is free at speeds of 64 kbps or higher for the remainder of their month, providing big cost savings and eliminating surprise overage charges.

(*E.g.*, https://www.idt.net/idt-introduces-boss-revolution-mobilesm-join-the-savings-revolution/).



(*E.g.*, https://www.youtube.com/watch?v=TwaksBuQcbw).

**B. Information We Collect.** Depending on the particular Service, we may automatically collect the following information:

- Boss Revolution security code, password and login credentials
- Service related diagnostic and performance information, including how you use our Services and performance logs
- call records, frequently called numbers, and network traffic data
- messages sent with our Services, including chats, photos, videos and voice messages
- personal, phone or social network contact information
- information about your device, including model, browser, operating system, platform type, application software, mobile network, device identifiers and numbers, and Internet connection speed
- browsing, searching and buying activity

(*E.g.*, https://www.bossrevolution.com/en-us/privacy-policy-rorow).

50.    Defendant performed the step of communicating results of said monitoring to a telecommunication services provider, wherein said telecommunication services provider processes said results and communicates processed results to said user.  For example, the Boss Revolution app charged users based on their actual use of telecommunication services such as call duration, data consumption, and messaging activity. To enable this, IDT servers ("telecommunication services provider") collected the monitored information from the Boss Revolution app, including call logs and details regarding how the user utilized IDT services. Further, BOSS Revolution

provided calling services through IDT-affiliated telecom providers, where charges for the pay-as-you-go services depended on factors such as the call destination and the carrier, with the total applicable cost displayed to the user. In addition, BOSS Revolution Mobile users had their data charges capped at $30 per month. Therefore, it would be apparent to a person having ordinary skill in the art that the Boss Revolution app transmitted the monitored call and data usage information ("results of said monitoring") to the IDT servers, enabling IDT to calculate the user's applicable per-minute, per megabyte, or monthly charges ("processed results to said user").

**B. Information We Collect.** Depending on the particular Service, we may automatically collect the following information:

- Boss Revolution security code, password and login credentials
- Service related diagnostic and performance information, including how you use our Services and performance logs
- call records, frequently called numbers, and network traffic data
- messages sent with our Services, including chats, photos, videos and voice messages
- personal, phone or social network contact information
- information about your device, including model, browser, operating system, platform type, application software, mobile network, device identifiers and numbers, and Internet connection speed
- browsing, searching and buying activity

(*E.g.*, https://www.bossrevolution.com/en-us/privacy-policy-rorow).

1.4 U.S. Service Providers. In the United States (a) IDT Domestic Telecom, Inc. is the Service Provider of BR Mobile and BR Pinless and the telecommunication services underlying BR Mobile and BR Pinless are provided by our affiliate IDT Telecom, Inc. and the third party carriers we engage. (b) IMTU and DMTU are distributed and processed by IDT Domestic Telecom, Inc. and the underlying services for IMTU and DMTU are provided by Third Party Operators (as defined in Section 6.4) and (c) Money Transfer is provided by IDT Payment Services, Inc., a licensed money transmitter, or IDT Payment Services of New York LLC, licensed as a Money Transmitter by the New York State Department of Financial Services. For the Service Provider in your country, see Section 2.3 of this License.

(*E.g.*, https://cdn.bossrevolution.com/app/terms-en.html).

BOSS Revolution Mobile customers pay just $5/month for their line and then pay only for what they use. Pay-as-you-go rates are affordable and simple:

- Domestic Airtime – just 1.5 cents per minute
- Domestic Texts – just 0.5 cents, and
- Data – just 1.5 cents per megabyte.

(*E.g.*, https://www.idt.net/idt-introduces-boss-revolution-mobilesm-join-the-savings-revolution/).

Also, BOSS Revolution Mobile customers' data spend is capped at only $30 per month. After a customer spends $30 on data, data is free at speeds of 64 kbps or higher for the remainder of their month, providing big cost savings and eliminating surprise overage charges.

(*E.g.*, https://www.idt.net/idt-introduces-boss-revolution-mobilesm-join-the-savings-revolution/).

6.6 Consent to Receive Messages. Subject to your applicable Service Terms and App feature set, you consent to receive SMS/MMS, in-App messages including push notifications, text and/or email messages from IDT and its affiliates regarding account management activities and special offers. This consent is specific to the phone number(s) you provide to us to use the Services and open accounts. Message and data rates may apply when you receive SMS/MMS, text or push notification messages on your mobile phone. You may refuse to consent to receive calls and texts from IDT and its affiliates that require your consent, including autodialed, pre-recorded or artificial voice telemarketing calls. You may also withdraw your previously given consent to receive such calls and texts. Your ability to manage and use certain features of the Services could be limited if you refuse or withdraw your consent to receive these messages.

(*E.g.*, https://cdn.bossrevolution.com/app/terms-en.html).

A Plan's fee covers only calls to in-Plan destinations, carriers and phone types. Any call to a destination, carrier or phone type not included in the Plan, or calls made by other telephone numbers registered to your Pinless Account, will be funded from the consumer's pay-as-you-go Pinless Account. If your Pinless Account does not have sufficient balance, then a call to a destination, carrier or phone type not included in the Plan will be blocked.

(*E.g.*, https://www.bossrevolution.com/en-us/unlimited-plans-terms).

4.5    Charges.

A.    Paygo.  The charges for any specific call placed with BR Pinless, including calls to Directory Assistance and toll free numbers, consist of a per minute rate to the destination called plus any applicable taxes and charges.  The Website and App contain the per minute rates and other charges for using BR Pinless, including the recurring fee for any Paygo Savings Pass. The rate per minute for calls made from 800 access are billed an additional 1.5 cents per minute. An additional $1 is added to the first minute rate for each call from a payphone.  Call duration is based on one minute rounding and fractions of minutes will be rounded up to the next minute. The total cost of each call is rounded to the next full cent.  The charges incurred will be automatically deducted from the balance in your Pinless Account.

(*E.g.*, https://cdn.bossrevolution.com/Content/pdf/IDT-TermsofUse-TelecomProducts.pdf).

51.    Defendant performed a step of receiving a payment from the user, the payment obtained from a payment transaction wherein: a payment is received from the user at a point-of-sale together with an account identifier, data indicative of the payment transaction is received from the point-of-sale by the telecommunication services provider, and an amount of money equal to

23

the amount of payment is received from a point-of-sale proprietor by the telecommunication services provider. The specification described exemplary "point-of-sale" as "e.g., a retail merchant site; a vending machine; and an automated teller machine (ATM). The payment at the point-of-sale was made, e.g., in the form of cash; as a debit card transaction; and as a credit card transaction effected via communication with a computer." (Ex, A at 3:58–64). The merchant site ("retail merchant site"), where services were offered performed the same functionality as disclosed in the patent, which was facilitating the payment based on the usage of telecommunication services by the customer using Defendant's API, as show below. For example, the Boss Revolution app allowed the user to recharge or make payments for the used telecommunication services through multiple payment methods, including credit cards, debit cards, and other online means. Further, such payment methods involved the user making a payment through a digital interface or payment gateway ("point-of-sale") linked to the user's account or mobile number ("account identifier"), and upon completion of the transaction, transaction details were generated and communicated ("data indicative of the payment transaction is received") to IDT (the telecommunication services provider). Therefore, upon information and belief, the payment for the services was received by the telecommunication services provider from the payment processor or financial institution, and an amount of money equal to the amount of payment was received from a point-of-sale proprietor by the services provider. Thus, the retail merchant site here acted as a point-of-sale (point-of-sale terminal) based on similar functionality. For example, after the monthly bill was generated and uploaded on the '2 Checkout dashboard' ("an account identifier"), the customer paid the bill ("receiving a payment from the user") for the availed services through multiple payment methods such as Debit/Credit card, Digital wallets, Online banking, and Offline banking ("payment obtained from a payment transaction"). Therefore, upon information and belief, the payment for

24

the bill was received by the telecommunication services provider from the payment ("point-of-sale") proprietor.

> BOSS Revolution Mobile customers pay just $5/month for their line and then pay only for what they use. Pay-as-you-go rates are affordable and simple:
>
> - Domestic Airtime – just 1.5 cents per minute
> - Domestic Texts – just 0.5 cents, and
> - Data – just 1.5 cents per megabyte.

(*E.g.*, https://cdn.bossrevolution.com/Content/pdf/IDT-TermsofUse-TelecomProducts.pdf).

> BOSS Revolution app customers can recharge in the app or online with a credit or debit card, a BOSS Revolution Recharge Card, or Google Play account. Customers can also recharge with cash at any BOSS Revolution retailer in eight countries including the US, Canada and the UK.

(*E.g.*, https://www.idt.net/boss-revolution-releases-major-update-to-its-popular-calling-app/).

> A. Adding Funds to Your Account. You can fund your Account through the App by (i) redeeming a top-up card/voucher in the App, (ii) using your credit or debit card on file with us and/or (iii) using your applicable App Store account. You will be able to add funds in such denominations and amounts as are displayed in the user interface from time to time in the App. Amounts purchased through your iTunes or Google Play account will be billed/debited by Apple or Google (if and when supported). Once processed, all in App funding transactions are final and may not be exchanged, returned, refunded, transferred or reimbursed, except as set forth in the Service Terms applicable to you or as required by law.

(*E.g.*, https://cdn.bossrevolution.com/app/terms-en.html).



(*E.g.*,    https://account.bossrevolution.com/login?postLoginRedirectUrl=https%3A%2F%2

Faccount.bossrevolution.com%2Fcalling%2Frecharge%3Flanguage%3Den%26authDefaultCoun

try%3DUS&language=en&authDefaultCountry=US).



(*E.g.*, https://www.youtube.com/watch?v=TLNVFh4q3n4).

52.    Plaintiff was damaged as a result of Defendant's infringing conduct.  Defendant is thus liable to Plaintiff for damages in an amount that adequately compensates Plaintiff for such infringement of the '127 Patent, *i.e.*, in an amount that by law cannot be less than would constitute a reasonable royalty for the use of the patented technology, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

53.    The claims of the '127 Patent are method claims to which the marking requirements are not applicable.  Plaintiff has therefore complied with the marking statute.

## V.  **JURY DEMAND**

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

a.    Judgment that claim 1 of United States Patent No. 7,013,127 was infringed directly either literally and/or under the doctrine of equivalents, by Defendant;

b.    Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of herein, and an accounting of all infringements and damages not presented at trial;

c.    That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of herein; and

d.    That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

July 27, 2026                                    Respectfully Submitted,

                                                */s/ Antranig Garibian*
                                                Antranig Garibian, Esq. (Bar Id 008492005)
                                                Garibian Law Offices, P.C.
                                                261 Old York Road, Unit 427
                                                Jenkintown, PA 19046
                                                (215) 326-9179
                                                ag@garibianlaw.com

                                                David R. Bennett (IL Bar No. 6244214)
                                                (motion for *pro hac vice* to be filed)
                                                Direction IP Law
                                                P.O. Box 14184
                                                Chicago, IL 60614-0184
                                                (312) 291-1667
                                                dbennett@directionip.com

                                                *Counsel for Plaintiff Pay As You Go, LLC*

28